## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHAVON REESE, | : | |
| | : | |
| Plaintiff and | : | CIVIL ACTION |
| Counterclaim-Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLSTATE VEHICLE AND | : | |
| PROPERTY INSURANCE, | : | |
| | : | NO. 14-1034 |
| Defendant, Counterclaim- | : | |
| Plaintiff, and Third-Party | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LAMONT RICKETS, | : | |
| | : | |
| Third-Party Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                          December 9, 2015

 Currently pending before the Court is the Motion for Summary Judgment by Defendant

Allstate Vehicle and Property Insurance Company.  For the following reasons, the Motion is

denied.

## I.    FACTUAL BACKGROUND[1]

### A.    Procedural History

On January 21, 2014, Plaintiff Chavon Reese ("Plaintiff") filed a Complaint against

---

[1]  For ease of discussion, the Court follows the progression of the statement of facts
provided by Defendant, to which Plaintiff has given a seriatim answer.  To the extent the parties
agree on a particular fact, the Court refers only to Defendant's Statement of Undisputed Facts
and Plaintiff's Response.  To the extent a particular fact is disputed, the Court will present the
parties' opposing arguments and cite to the relevant evidence provided.

Defendant Allstate Vehicle and Property Insurance Company ("Defendant" or "Allstate") in the Philadelphia County Court of Common Pleas. (Defendant's Statement of Undisputed Facts ("DSUF") ¶ 1; Plaintiff's Response to Statement of Undisputed Facts ("PRSUF" ¶ 1.) The Complaint alleged one count for breach of contract based on a fire loss, occurring on or about February 17, 2013, at Plaintiff's property located at 2601 N. 27th Street in Philadelphia, Pennsylvania (the "Property"). (DSUF ¶ 2; PRSUF ¶ 2.) Defendant removed the case to federal court, after which it filed an Answer and Counterclaim for civil insurance fraud against Plaintiff pursuant to the Pennsylvania Insurance Fraud Statute, 18 Pa.C.S. § 4117. (DSUF ¶ 3; PRSUF ¶ 3.) On March 11, 2014, Plaintiff filed her Answer with Affirmative Defenses to the Counterclaim. (DSUF ¶ 4; PRSUF ¶ 4.) Subsequently, on July 15, 2014, Allstate filed a Third Party Complaint for Civil Insurance Fraud against Third-party Defendant Lamont Ricketts ("Ricketts"), also pursuant to Pennsylvania Insurance Fraud Statute, 18 Pa.C.S. § 4117. (DSUF ¶ 4; PRSUF ¶ 4.) Ricketts submitted his Answer with Affirmative Defenses to the Third Party Complaint on June 1, 2015. (DSUF ¶ 5; PRSUF ¶ 5.)

The parties then proceeded through discovery. On August 10, 2015, Defendant filed the current Motion for Summary Judgment seeking judgment in its favor on the Complaint, its Counterclaim against Plaintiff, and its Third-party Complaint against Ricketts. Plaintiff responded on August 31, 2015, and Defendant filed a Reply Brief on September 6, 2015. Ricketts has not filed any response.

### B.    The Policy

At the time of the February 17, 2013 fire, the Property was insured by a homeowners insurance policy issued to Plaintiff by Allstate under policy number 952848816. (DSUF ¶ 8;

PRSUF ¶ 8.)  The Policy contained the following forms: (a) Pennsylvania House and Home

Policy form AVP58; (b) Roof Surfaces Endorsement form AVP84; (c) Tropical Cyclone

Deductible Endorsement form AVP118; and (d) Windstorm and Hail Deductible Endorsement

form AVP82.  (<u>Id.</u>; Def.'s Mot. Summ. J., Ex. F.)

The Policy included multiple provisions, including the following:

**Definitions Used In This Policy**
Throughout this policy, when the following words appear in bold type, they are
defined as follows:
. . .
5.    **Insured person(s)**—means **you** and, if a resident of **your** household:
      (a)    any relative; and
      (b)    any person under the age of 21 in **your** care.
. . .
14.    **You** or **your**—means the person listed under Named Insured(s) on the Policy
       Declarations as the insured and that person's resident spouse.

(Def.'s Mot. Summ. J., Ex. F, 4–5.)

**Misrepresentation, Fraud or Concealment**
. . .
**We** do not cover any loss or **occurrence** in which any **insured person** has concealed
or misrepresented any material fact or circumstance.

(<u>Id.</u> at 6.)

**Losses We cover Under Coverages A and B:**
**We** will cover sudden and accidental direct physical loss to property described in
**Dwelling Protection–Coverage A** and **Other Structures Protection–Coverage B**
except as limited or excluded in this policy.

(<u>Id.</u> at 8.)

**Additional Living Expense**
**We** will pay the reasonable increase in living expenses necessary to maintain **your**
normal standard of living when a direct physical loss **we** cover under **Dwelling
Protection–Coverage A, Other Structures Protection–Coverage B** or **Personal
Property Protection–Coverage C** makes **your residence premises** uninhabitable.
However, additional living expense due to remediation of mold, fungus, wet rot, or

dry rot will not be paid in addition to any amounts paid or payable under **Section 1 Conditions, Mold, Fungus, Wet Rot And Dry Rot Remediation As A Direct Result Of A Covered Water Loss.**

(Id. at 7.)

### C.    Allstate's Investigation of the February 17, 2013 Fire

On February 17, 2013, Plaintiff reported a fire loss to Allstate through her public adjuster, Tri-State Public Adjusters, Inc. ("Tri-State"). (DSUF ¶ 10; PRSUF ¶ 10.) Plaintiff made claims for damage to the dwelling, personal property, and additional living expenses. (Def.'s Mot. Summ. J., Ex. 11.) Plaintiff's dwelling and personal property claim was referred to Allstate's Special Investigation Unit on February 18, 2013, and was assigned to Special Investigation Unit adjuster Nancy Rosen. (Def.'s Mot. Summ. J., Ex. H.) Plaintiff's claim for additional living expenses ("ALE") was assigned to ALE adjuster Charmaine Grove. (DSUF ¶ 12; PRSUF ¶ 12.) In addition, Allstate retained the services of Art Czajkowski of J.F. Goetz & Associates. (DSUF ¶ 14; PRSUF ¶ 14.) Two days after the loss, Mr. Czajkowski inspected the Property and interviewed Reese, Ricketts, and other witnesses. (Pl.'s Resp. Opp'n Summ. J., Ex. D.) Mr. Czajkowski concluded as follows:

> From the fire patterns observed, the information received, and the physical evidence examined, the fire is accidental and the cause is undetermined. Although the cause is undetermined, the probable cause from the information reviewed and the physical evidence examined is the permanent electrical house wiring installed in the second floor ceiling supplied by the sub panel located in the second floor hallway.

(Pl.'s Resp. Opp'n Summ. J., Ex. D, 8.) Similarly, the Philadelphia Fire Department concluded that the cause of the fire was "[e]lectrical [w]iring." (Pl.'s Resp. Opp'n Summ. J., Ex. E, 2.)

On March 19, 2013, Plaintiff gave a recorded statement, and, on April 22, 2013, she

4

submitted to an Examination Under Oath ("EUO").[2]  (Def.'s Mot. Sum. J., Exs. K, L.)  On March 16, 2013, Marion Stead, the prior owner of the Property, gave a recorded statement, (Def.'s Mot. Summ. J., Ex. M), and, on July 13, 2015, Lamont Ricketts, Plaintiff's boyfriend, appeared for a deposition.  (Def.'s Mot. Summ. J., Ex. N.)

>    **D.**      **Plaintiff's Residency at the Property**

According to the deed of record, Plaintiff purchased the property from Stead on August 18, 2013.  (DSUF ¶ 20; PRSUF ¶ 20; Def.'s Mot. Summ. J., Ex. O.)  Plaintiff testified, in her EUO, that the purchase price of the Property was $7,500.  (DSUF ¶ 22; PRSUF ¶ 22.)  Stead, however, reported that she sold the Property to Plaintiff in August or September 2012 for $20,000, even though Plaintiff had not yet fully paid the purchase price.[3]  (Def.'s Mot. Summ. J., Ex. M, 3.)

According to Mr. Czajkowski's report, Plaintiff stated that she had lived at the Property for about a year with her three children.  (Def.'s Mot. Summ. J., Ex I, 2.).  Similarly, Ricketts reported that Plaintiff had been living at the Property for about a year with her three children under a lease/purchase agreement, and that the deed was "charged" in June when Reese finished paying for the Property.  (Id.)  Plaintiff later testified at her deposition that she moved into the property in approximately November 2012.  (Def.'s Mot. Summ. J., Ex. L, Dep. of Chavon Reese, Apr. 22, 2013 ("Reese Dep."), 62:1–11.)

As of October 26, 2012, the Property did not have a water meter.  (Def.'s Mot. Summ. J.,

---

[2]  Defendant repeatedly refers to the March 22, 2013 EUO, which, according to Defendant's own documents, is an incorrect date.  (Def.'s Mot. Summ. J., Ex. L.)

[3]  According to Plaintiff, Stead's statement is biased and unreliable as both Stead's child and Plaintiff's three children were fathered by Ricketts.  (Pl.'s Resp. Opp'n Summ. J., Ex. F, 5.)

Ex. P.)  The missing meter was replaced on approximately November 6, 2012.  (Id.)  Plaintiff

asserts that the Property nonetheless had both water and sewer access prior to that time.[4]  In

addition, bills regarding electrical service at the Property received from the Exelon Corporation

(PECO) reveal that although electrical service at the Property was established in Plaintiff's name

from January 24, 2013 to April 11, 2013, there was no electrical usage at the Property prior to

February 2013.  (Def.'s Mot. Summ. J., Ex. Q.)  The bills, however, are somewhat confusing to

read, as the bill from January 24, 2013 to February 7, 2013 inexplicably reinstates thousands of

dollars of bad debt.  (Id.)

     Mr. Czajkowski's investigation of the loss revealed an electric water heater in the

basement of the Property.  (DSUF ¶ 29; PRSUF ¶ 29.)  Defendant also argues that photographs

taken by Mr. Czajkowski showed no children's toys, children's clothes, high chairs, cribs,

kitchen appliances or cookware in use.  (DSUF ¶ 29; Def.'s Mot. Summ. J., Ex. I.)  According to

Defendant's description of the photographs, the only personal contents of the Property appeared

to be men's clothing, electronics, and an adult bicycle.  (Id.)  Mr. Czajkowski, however, did, in

fact, note both a crib and toy boxes, and one of the pictures appears to show woman's clothing.

(Id.)  In addition, according to the investigation done and pictures taken by the Philadelphia Fire

Department, the Property contained children's party decorations, cookware in use, a TV, a

colorful lamp, toys, and stuffed animals.  (Pl.'s Resp. Opp'n Summ. J., Ex. D, 14, 15 18–19,

32–34.)

_____

     [4]  Plaintiff argues that an FAQ section from Philadelphia Water Department's website
shows that the absence of a water meter does not conclusively establish lack of water access.
(Pl.'s Mot. Summ. J., Ex. J.)  By the same token, however, the FAQ section from the website
does not prove that the Property was, in fact, receiving water and sewage access as of October
2012.

E.      <u>Condition of the Property Prior to the Feburary 17, 2013 Fire</u>

Mr. Czajkowski's report indicates that he inspected electrical wiring in the basement and

found it to have been manufactured on June 23, 2012 and November 12, 2012.  (Def.'s Mot.

Summ. J., Ex. I.)  He further noted that this yellow wiring was used throughout the building and

was not installed correctly in many areas.  (<u>Id.</u> at 7.)  Photographs taken by the Philadelphia Fire

Department show that other colors of wiring were also used, and that the main breaker panel in

the basement contained black and white wiring.  (Pl.'s Resp. Opp'n Sum. J., Ex. D, 25.)

Contrary to the wiring dates, Plaintiff stated, in her interview with Mr. Czajkowski on

February 19, 2013, that there had not been any electrical or plumbing work done at the Property

since she purchased it.  (Def.'s Mot. Summ. J., Ex. I, 2.)  Similarly, in Mr. Czajkowski's

interview of Ricketts on February 19, 2013, Mr. Ricketts denied that there had been either

electrical or plumbing work done since Plaintiff purchased the Property.  (<u>Id.</u>)  Plaintiff

reiterated, in her March 19, 2013 recorded statement, that no electrical work had been done at the

Property, although she had done done roof repair, flooring, and plumbing work, which was paid

for by both she and Ricketts.  (Def.'s Mot. Summ. J., Ex. K, 25–28.)  At her April 22, 2013

EUO, Plaintiff again repeated that after purchasing the Property, she only did paint, tile, roof,

window, and outside step work, but that no plumbing or electrical repairs or renovations were

made.  (Def.'s Mot. Summ. J., Ex. L, 59–60.)  Ricketts, on the other hand, testified at his

deposition that he was not involved in and did not pay for any renovations or work done at the

Property after Plaintiff purchased it, but before the fire.  (Def.'s Mot. Summ. J., Ex. N., Dep. of

Lamont Ricketts, July 13, 2015 ("Ricketts Dep."), 27:25–31:25.)  As noted by Plaintiff, after the

fire and before the deposition, Ricketts suffered a stroke which has affected his memory.  (<u>Id.</u> at

7

6:14–7:15.)

F.     **Reese's Claim for Additional Living Expenses**

In addition to her claim for damage to the Property, Plaintiff sought coverage under the Policy for additional living expenses ("ALE"), including temporary housing.  (DSUF ¶ 40; PRSUF ¶ 40.)  On February 17, 2013, the hotel where Plaintiff was temporarily staying after the fire confirmed that Plaintiff's party included her three children (ages five years, three years, and a few month-old infant) and her boyfriend (Ricketts), and that they were staying in two adjoining rooms booked by Plaintiff's public adjuster.  (DSUF ¶ 41; PRSUF ¶ 41; Def.'s Mot. Summ. J., Ex. H, Bates No. 0052.)  Shortly after making that confirmation, Allstate advised Plaintiff's public adjuster that Allstate would only pay for one room because Ricketts was not covered under the Policy.  (DSUF ¶ 42; PRSUF ¶ 42; Def.'s Mot. Summ. J., Ex. H, Bates No. 0052.)  The following morning, Plaintiff, through her public adjuster, again requested that Allstate arrange two temporary hotel rooms based upon the ages of the children (which he did not provide). (DSUF ¶ 43; PRSUF ¶ 43; Def.'s Mot. Summ. J., Ex. H, Bates No. 0051.)  Allstate again refused ALE coverage for the second room for Ricketts as he was not covered under the Policy.

Later on February 18, 2013, Plaintiff's public adjuster informed ALE adjuster Charmaine Grove that the residents of the Property included Plaintiff, her three children, and her boyfriend Ricketts (who was later described as her fiancé).  (DSUF ¶ 44; PRSUF ¶ 44; Def.'s Mot. Summ. J., Ex. H, Bates No. 0050-51.)  Grove indicated that because only one adult was covered under the Policy and the children were young, Allstate would only cover one room.  (Id.)  Grove also explained that Plaintiff could submit receipts for meals during her stay if the hotel room did not have a kitchen, but re-emphasized that Ricketts was not covered.  (Id.)  Plaintiff submitted

8

multiple receipts, some of which included larger meal portions or small charges for "men's" items from Forman Mills.  (Def.'s Mot. Summ. J., Ex. R.)

At his deposition, Ricketts testified—contrary to the public adjuster's comment to Grove—that he was not living at the Property with Plaintiff prior to the February 17, 2013 fire, and that he did not stay at the Property on a regular basis.  (Ricketts Dep. 13:25–15:22, 32:22–33:25.)  He also indicated that he did not keep any significant belongings at the Property during the time Plaintiff owned it prior to the fire.  (Id. at 33:12–15, 69:21–70:21.)

During the time of her EUO, Plaintiff and her children were residing in a temporary housing rental property arranged and paid for by Allstate.  (DSUF ¶ 48; PRSUF ¶ 48.)  Because she was unhappy with this property, Plaintiff contacted Grove, via email on April 16, 2013, and advised as follows: "I found a place 1600 a month they want first last and security they are will to do a 3 month lease they only wanna deal with me can u send the money so I can handle on my own.they don't deal with 3rd party."  (Def.'s Mot. Summ. J., Ex. S, 8.)  This property was located at 3513 North Smedley Street, Philadelphia, PA 19140.  (Id. at 6.)  Plaintiff, through her then-counsel, provided a copy of a two-page lease for that property to Grove on approximately July 29, 2013 ("Reese Smedley Lease").  (DSUF ¶ 52; PRSUF ¶ 52; Def.'s Mot. Summ. J., Ex. T.)  The Reese Smedley Lease indicated that the landlord was SODS PROPERTIES, LLC, that the Lease began on April 22, 2013, and that the Lease was scheduled to terminate on August 22, 2013.  (Def.'s Mot. Summ. J., Ex. T.)  In addition, the Lease indicated that the rent for the property was $1,600 per month, payable on the 22nd day of each month, and that Plaintiff was required to pay a security deposit of $4,800.  (Id.)  Page two of the Reese Smedley Lease identifies Yossi Batushansky (SODS PROPERTIES) as the owner of the temporary housing

property.  (Id.)  No written signatures appeared on this Lease.  (Id.)

On September 17, 2013, Yossi Avraham, a partner in the entity which owned the temporary housing property, initiated suit against Plaintiff in Philadelphia Municipal Court seeking payment of defaulted rent for August and September 2013, as well as $150 in late fees and possession of the property.  (DSUF ¶ 58; PRSUF ¶ 58.)  Attached to the complaint was a copy of a four-page lease agreement for 3513 N. Smedley Street,[5] dated May 1, 2013, between S.S.D.Y. Properties, LLC and Plaintiff ("Avraham Smedley Lease").  (DSUF ¶ 59; PRSUF ¶ 59; Def.'s Mot. Summ. J., Ex. V.)  The term of the Avraham Smedly Lease began on May 1, 2013 and was scheduled to terminate on May 1, 2014.  (Def.'s Mot. Summ. J., Ex. V.)  According to the Avraham Smedley Lease, the rent for the temporary housing property was $1,200, payable in advance on the first day of each month, and Plaintiff was required to pay a security deposit of $3,600.  (Id.)  The Avraham Smedley Lease was signed by both a representative for the landlord of the Property and Plaintiff on May 1, 2013.  (Id.)  On October 17, 2013, default judgment was entered against Plaintiff in the amount of $3,925 for non-payment of rent and/or utilities.  (DSUF ¶ 65; PRSUF ¶ 65.)  Possession of the Property was granted to the owner of the Property effective October 17, 2013.  (Id.)

### G.    Denial of Coverage

On August 15, 2013, Allstate sent Plaintiff a denial letter stating that Allstate's investigation of the claim revealed that Plaintiff made misrepresentations of material facts and that the February 17, 2013 loss was not covered under the terms, conditions, and exclusions of

---

[5] Defendant states that this lease covers 3413 Smedley Street, but the attached exhibit states "3513 Smedley Street."  (Def.'s Mot. Summ. J., Ex. V.)

the Policy, including, but not limited to, the following Policy provisions:

> Misrepresentation, Fraud or Concealment
> . . .
> We do not cover any loss or occurrence in which any insured person has concealed
> or misrepresented any material fact or circumstance.

(Def.'s Mot. Summ. J., Ex. X.)  In addition, by correspondence dated August 16, 2013, Allstate

advised as follows:

> As you know Allstate Vehicle and Property Insurance Company ("Allstate") has been
> conducting an investigation into your claim for the fire loss which occurred on
> February 17, 2013.  On August 15, 2013 a copy of correspondence was forwarded to
> you advising that Allstate has concluded that there is no coverage under the Policy
> for the reported February 17, 2013 fire loss.  As a result, Allsate is not obligated to
> provide coverage for your additional living expenses.  As a courtesy, Allstate will
> continue to provide payment for your additional living expenses through September
> 22, 2013 after which time you will need to make arrangements for your own housing
> and expenses.  Please be advised that under the terms of the Advance Payment
> Agreements, signed by you, Allstate has the right to seek recovery of the advanced
> payments made to you during the investigation of the claim.

(Def.'s Mot. Summ. J., Ex. Y.)

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

11

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party.  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

### III.   DISCUSSION

### A.   Plaintiff's Claim for Breach of Contract

The initial portion of Defendant Allstate's Motion seeks summary judgment on Plaintiff's breach of contract claim.  As noted above, Plaintiff asserts that Allstate breached the insurance contract in this case by failing to provide coverage for her losses.  Allstate, on the other hand, contends that Plaintiff made multiple misrepresentations of material facts, which justified denial of coverage under the Policy.  Allstate further argues that Plaintiff has not otherwise produced any evidence of its alleged breach of contract.

Under Pennsylvania law, which governs interpretation of the present Policy, several well-established principles control.  J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004).  "As a threshold matter, '[t]he task of interpreting a contract is generally performed by a court, rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.'"  Id. (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).  Where an insurance policy provision is ambiguous—such as where the questionable language is "reasonably susceptible of different constructions and capable of being understood in more than one sense"—it is to "be construed against the insurer and in favor of the insured. . . . "  Id. (internal quotations omitted).  Where the insurance policy language is clear and unambiguous, however, the court must enforce that language.  Id. (citing Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999)) (further citations omitted).  Stated differently, "a court must refrain from torturing the language of a policy to create ambiguities where none exist," McMillan v. State Mut. Life Assur. Co. of Am., 922 F.2d 1073, 1075 (3d Cir. 1990), and should, wherever possible, "interpret the policy so

13

as to avoid ambiguities and give effect to all of its provisions." Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987).  "'Where the policy contains definitions for the words contained therein, the court will apply those definitions in interpreting the policy.'" J.C. Penney, 393 F.3d at 363 (quoting Monti v. Rockwood Ins. Co., 450 A.2d 24, 25 (Pa. 1982) (further citations omitted)).  Ultimately, the court may not "rewrite the insurance contract, under the guise of judicial interpretation, to expand the coverage beyond that as provided in the policy." Occidental Fire & Cas. Co. of N. Carolina v. Reber Corp., No. Civ.A.04-876, 2004 WL 1529176, at *3 (E.D. Pa. June 28, 2004) (citing Guardian Life Ins. Co. v. Zerance, 479 A.2d 949, 953 (Pa. 1984)).

In cases of insurance coverage disputes in Pennsylvania, "the insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage." Hamm v. Allstate Prop. & Cas. Ins. Co., 908 F. Supp. 2d 656, 666 (W.D. Pa. 2012) (quoting State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009)).  The burden then shifts to the insurer to demonstrate "that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." Id.  For purposes of the Motion presently before the Court, it is not disputed that the losses would otherwise be covered by the Policy.  Thus, the Court's focus is the propriety of Allstate's grounds for denying coverage. Henriquez-Disla v. Allstate Prop. and Cas. Ins. Co., No. Civ.A.13-284, 2015 WL 539550, at *3 (E.D. Pa. Feb. 10, 2015).

As noted above, Defendant denied coverage to Plaintiff under the following provision:

**Misrepresentation, Fraud or Concealment**
. . .
**We** do not cover any loss or **occurrence** in which any **insured person** has concealed or misrepresented any material fact or circumstance.

14

(Def.'s Mot. Summ. J., Ex. F, 4–5.)  Pennsylvania courts have long held that a violation of the fraud and concealment provision of an insurance policy serves as a complete bar to the insured's recovery under the policy.  See Sack v. Glens Falls Ins. Co., 61 A.2d 852, 852–53 (Pa. 1984); Ellis v. Agricultural Ins. Co., 7 Pa. Super. 264, 265 (1898).  "So fundamental is the proposition that one cannot benefit from attempted or effected fraud, it needs no elaboration.  Where any such fraud is shown, the forfeiture provisions of an insurance policy are to be strictly enforced." Lavin v. Fireman's Ins. Co. of Newark, N.J., No. Civ.A.91-0114, 1992 WL 157691, at *2 (E.D. Pa. June 29, 1992) (quotation omitted).

     To void an insurance policy under the law of Pennsylvania, the burden is placed on the insurer to prove that: (1) the insured made a false representation; (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured.  Saracco v. Vigilant Ins. Co., No. Civ.A.99-3502, 2000 WL 202274, at *2 (E.D. Pa. Feb. 22, 2000), aff'd, 250 F.3d 736 (3d Cir. 2001).  Under the second element, the false representation must be made knowingly or in bad faith.  "Innocent mistakes, even when involving material misrepresentations, are insufficient to void an [insurance] contract." Justofin v. Metro. Life Ins. Co., Civ. No. 01-6266, 2002 WL 1773007, at *4 (E.D. Pa. Jul. 29, 2002) (citing Am. Franklin Life Ins. Co. v. Galati, 776 F. Supp. 1054, 1060 (E.D. Pa. 1991)).  As to the third element, in the context of an insurance contract, "[t]he question of materiality is generally considered one of fact and law, but if the facts misrepresented are so obviously important that 'reasonable minds cannot differ on the question of materiality,' then the question becomes one of law that the court can decide at the summary judgment stage." Parasco v. Pac. Indem. Co., 920 F. Supp. 647, 654 (E.D. Pa. 1996) (quoting

15

Gould v. Am.-Hawaiian S.S. Co., 535 F.2d 761, 771 (3d Cir. 1976)).  "A misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented."  Lavin, 1992 WL 157691, at *2 (quoting Long v. Ins. Co. of N. Am., 670 F.2d 930, 934 (10th Cir. 1982)).  "A misrepresentation is also material 'if [it] may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.'"  Peer v. Minnesota Mut. Fire & Cas. Co., No. Civ.A.93-2338, 1995 WL 141899, at *10 (E.D. Pa. March 27, 1995) (quoting Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 184 (2d Cir. 1984)).

Allstate now contends that Plaintiff made multiple misrepresentations of material facts in the presentation of her claim, including when she purchased the Property, when she moved into the Property, the nature of repairs performed at the Property prior to the fire, whether Ricketts resided at the Property, and the amount of additional living expenses incurred by Plaintiff.  The Court addresses each one individually.

### 1.   The Purchase Date of the Property

With respect to the date that Plaintiff purchased the Property, the deed produced in discovery shows that the Property was transferred from Marion Stead to Plaintiff on August 18, 2012,[6] for the sum of $7,500.  (Def.'s Mot. Summ. J., Ex. O.)  In her April 22, 2013 EUO, Plaintiff also stated that she bought the Property in August 2012 for $7,500.  (Def.'s Mot. Summ. J., Ex. L, 13.)  As such, Plaintiff's statement is clearly and unequivocally confirmed by a

---

[6] Defendant's Motion asserts that the deed shows an August 18, 2013 transfer date. (Def.'s Mot. Summ. J. ¶ 73.)  That assertion is flatly contradicted by the cited evidence.

notarized document of record.

In an effort to discredit Plaintiff's testimony as a misrepresentation, however, Defendant cites to two pieces of contradictory evidence.  First, Defendant asserts that Ricketts told Mr. Czajkowski that "Ms. Reese charged the deed in June when she finished paying for the property." (Def.'s Mot. Summ. J., Ex. I, 2.)  Second, Allstate claims that Marion Stead confirmed that Plaintiff's purchase date of the Property was "August, September 2012," although she stated that the purchase price was $20,000, which Plaintiff had been paying to her in bits and pieces.[7]  (Pl.'s Resp. Opp'n Summ. J., Ex. H, 3–5.)

At best, however, such evidence merely creates a genuine issue of material fact as to whether Plaintiff made a misrepresentation as to the date and purchase price of the Property.  At worst, this evidence consists of nothing more than confusing remarks that, aside from not clearly stating anything about the actual purchase date, are misrepresentations by individuals who are not "insured persons" and, thus, cannot justify denial of coverage under the Policy.  Construing the evidence in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists on this point.

### 2.    <u>The Date Plaintiff Moved Into the Property</u>

Allstate next contends that Plaintiff misrepresented material facts regarding when she moved into the Property.  In Plaintiff's EUO, Plaintiff stated that she purchased the Property in August 2012, but did not move in until November because she was getting the house ready. (Def.'s Mot. Summ. J., Ex. L, 62:2–14.)  Citing to several pieces of evidence, Defendant

---

[7] Notably, Defendant does not claim that the purchase price is a material fact.  Rather, it only asserts that the date Plaintiff purchased the Property is material.  (Def.'s Mot. Summ. J. ¶ 74.)

challenges this statement as a fraudulent misrepresentation justifying a denial of coverage.

First, Allstate claims that, during her recorded statement, Plaintiff seemingly indicated that she moved into the Property in August 2012.  Notably, however, the context of her remark suggests that it may have been a misunderstanding, particularly since the statement was being given over the phone while Plaintiff was tending to her infant.  (PRSUF ¶ 25; Pl.'s Resp. Opp'n Summ. J., Ex. F, 221.)  Specifically, the following exchange occurred:

> Q,   So Lamont paid for most of the $7,500 [for the house]?
> A.   Yes.
> Q.   What were the conditions when you purchased it?  I mean, when did you pay . . . Did you pay . . When did you finish . . . When was it done being paid for?
> A.   Oh, about November . . . November.
> Q.   You think in November of 2012?
> A.   Yes, yes.
> Q.   You moved in, in August.  Was it like a lease/purchase type deal?
> A.   Yeah, yeah.
> Q.   So did Lamont pay everything to her?  You didn't pay anything?
> A.   No, I pitched in as well.

(Def.'s Mot. Summ. J., Ex. F, 9.)  Given the compound question, the record is ambiguous as to whether Plaintiff was agreeing that she moved in to the Property in August or that it was a "lease/purchase type deal."  At no point during the remainder of this interview was Plaintiff explicitly questioned about her move-in date, making this evidence confusing at best.

Second, Defendant relies heavily on the report from Mr. Czajkowski, in which the investigator indicated that he interviewed both Ricketts and Plaintiff.  According to the report, Ricketts said that Plaintiff had been living in the property for about a year.  Aside from the fact that Mr. Czajkowski was paraphrasing Ricketts and not quoting him directly, any misrepresentation by Ricketts cannot—as noted above—be attributed to Plaintiff.  Moreover, in the report, Mr. Czajkowski remarked that "Ms. Reese stated that she has been living at the loss

property for about the last year." (Def.'s Mot. Summ. J., Ex. I, 2.)  Again, this statement—which merely constitutes the investigator's paraphrasing of Plaintiff's comment—does not clearly contradict Plaintiff's statement that she moved in to the Property in November.  Indeed, the report could be interpreted to mean that Plaintiff stated she had been living at the property since the prior year.  Without any sworn testimony from Mr. Czajkowski to clarify his summary of investigation, the Court cannot credit his hearsay statements over Plaintiff's averments.

Third, Allstate references photographs taken by Mr. Czajkowski that purportedly showed "a lack of children's toys, children's clothes, high chairs, [and] cribs," revealed "unplugged kitchen appliances with no evidence of kitchen utensils or cookware in use," and showed "men's clothing, electronics and an adult bicycle." (Def.'s Mot. Summ. J. ¶ 75.)  Allstate relies on these photographs as evidence that Plaintiff did not live in the Property as of November.  As noted above, however, Mr. Czajkowski's report also noted both a crib and toy boxes, and one of the pictures appeared to show woman's clothing.  (Id.)  In addition, a review of the investigation pictures taken by the Philadelphia Fire Department reveals that the Property contained children's party decorations, cookware in use, a TV, a colorful lamp, toys, and stuffed animals.  (Pl.'s Resp. Opp'n Summ. J., Ex. D, 14, 15 18–19, 32–34.)  Accordingly, the Court does not find that Mr. Czajkowski's selective photography unequivocally establishes that Plaintiff misrepresented her move-in date.

Fourth, Allstate contends that as of October 26, 2012, the water meter was missing from the Property and was ultimately replaced around November 6, 2012.  (Def.'s Mot. Summ. J. ¶ 75; Ex. P.)  If anything, this evidence simply establishes a meter violation that was reported in October 2012 and remedied in November 2012, coinciding with Plaintiff's reported move-in

date.

Finally, Allstate relies on documents from PECO to assert that there was no electrical service at the Property prior to January 24, 2013 and no electric usage at the Property prior to February 2013.  Closer inspection of the records, however, presents a confusing picture of what actually occurred.  Although the usage chart shows no electrical usage prior to February 2013, it inexplicably shows extensive electrical usage at the Property after the fire—in March and April 2013—when no one was residing at the Property.  (Def.'s Mot. Summ. J., Ex. Q.)  Moreover, as of June 2013, PECO billed Plaintiff for a total amount of $11,172.04, which included past due debts for service, suggesting Plaintiff did, in fact, have some electrical service prior to January 2013.  Notably, Allstate made no effort to depose anyone from PECO to determine whether Plaintiff actually had electrical service at the Property during the relevant times.

In sum, the evidence presents an obvious factual dispute as to precisely when Plaintiff moved into the Property (although Allstate appears to concede that she resided at the Property at the time of the fire).  Under Pennsylvania law, Allstate bears the burden of proving that Plaintiff made a false representation, meaning that—to satisfy the summary judgment standard—Allstate must show that there is no genuine issue of material fact regarding that misrepresentation.  Given the conflicting evidence and the questions of credibility that this Court is precluded from resolving at this juncture, the Court cannot find that Allstate has met that burden.[8]

### 3.    Nature of Repairs Performed at the Property

Next, Allstate contends that Plaintiff misrepresented the nature of the repairs performed

---

[8]  The Court also fails to see the materiality of a few month difference in Plaintiff's actual move-in date, so long as she resided at the Property at the time of the fire—a fact not disputed by Allstate.

at the Property prior to the fire loss.  Repeatedly, in her recorded statement, her statement to Czajkowski, and her EUO, Plaintiff reported that no electrical work had been done at the Property after she purchased it.[9]  (Def.'s Mot. Summ. J., Ex. I, 2; Def.'s Mot. Summ. J., Ex. K, 25–28; Def.'s Mot. Summ. J., Ex. L, 59–60.)  Mr. Czajkowski's report, on the other hand, indicates that he inspected electrical wiring in the basement and found it to have been manufactured on June 23, 2012 and November 12, 2012.  (Def.'s Mot. Summ. J., Ex. I.)  He further noted that this yellow wiring was used throughout the building and the dates on the wiring indicate that the electrical wiring was done recently.  (Id. at 7.)  Based on this evidence, Allstate concludes that Plaintiff made a material misrepresentation.

Again, however, these discrepancies are nothing more than a question of material fact which may not be resolved at the summary judgment stage.  Plaintiff's testimony about electrical repairs was consistent:  to her knowledge, no such repairs were done subsequent to the purchase of the Property.  For Allstate to now argue that the Court should blindly credit Mr. Czajkowski's hearsay report over Plaintiff's sworn statement in order to rule that Plaintiff made a material misrepresentation stands the summary judgment burden on its head.  While Allstate may be able to prove a misrepresentation at trial through the use of testimony regarding the wiring dates, the record now before the Court reveals an obvious issue of material fact on this point.

### 4.   Whether Ricketts Resided at the Property

Defendant also asserts that Plaintiff misrepresented material facts as to whether Ricketts resided at the Property.  As noted above, Ricketts testified that he did not live at the Property

---

[9]  There is some discrepancy in Plaintiff's statements as to whether plumbing work was done and as to who paid for some of the other repair work, including roofing and flooring, but Allstate has not established that such discrepancies are in any way material.

during the time Plaintiff owned the Property prior to the fire.[10]  Nonetheless, the temporary hotel

where Plaintiff resided after the fire confirmed that Plaintiff's party included her three small

children and her boyfriend Ricketts in two adjoining hotel rooms, which had been booked by her

public adjuster.  Despite her public adjuster's multiple attempts to arrange two temporary hotel

rooms for Plaintiff based on the size of her family, including her boyfriend Ricketts, Allstate

made clear that it would only pay for one hotel room because her children were so young and

only one adult was covered.  In addition, Allstate emphasized that although Plaintiff could

submit receipts if the hotel room did not have a kitchen, it would not cover meals for her

boyfriend.  Despite these instructions, Allstate contends that Plaintiff submitted receipts for

meals that included up to five people and for men's clothing.

On this point, the Court does not find any clear evidence of a misrepresentation by

Plaintiff.  Reading the record in the light most favorable to Plaintiff, her initial attempts to have

Allstate cover housing for Ricketts were not an effort at deception, but rather an explicit and

patent disagreement with Allstate about the scope of the coverage it would offer.[11]  With respect

to the receipts for meals, the Court agrees that a select few of the multitude of receipts seem to

request reimbursement for food in amounts greater than Plaintiff and her three young children

---

[10]  Interestingly, however, Allstate makes much of the fact that Mr. Czajkowski's photographs of the Property after the fire showed "men's clothing, electronics and an adult bicycle."  (Def.'s Mot. Summ. J. ¶ 75 & Ex. I.)

[11]  To the extent Defendant argues that the public adjuster misrepresented that Ricketts resided at the Property, this fact is not material to Allstate's coverage determination since the Policy made clear that the only people covered under the Policy were the insured, a spouse, any relative residing at the Property, and any person under the age of twenty-one in the insured's care and residing at the Property.  Even if Ricketts resided at the Property at the time of the fire, he would not have been covered.

would consume.  (Def.'s Mot. Summ. J., Ex. Q, 505, 506, 509, 514, 519, 524.)  Moreover, out of

the pile of submitted receipts demonstrating the purchase of obvious necessities, one receipt

suspiciously indicates that Plaintiff spent a total of $67.90 at Forman Mills on items that included

"denim jeans," "mens tube so," "men's LS," and "men's bas."  (Id. at 486.)  Absent some

explanation for or testimony regarding these receipts, however, the Court cannot clearly conclude

that Plaintiff was ordering food for Ricketts rather than ordering extra food to be eaten at a later

time, or that the items purchased at Forman Mills were for Ricketts rather than basic men's

clothing items that Plaintiff purchased for herself.

### 5.      The Amount of Additional Living Expenses Incurred by Plaintiff

The final alleged misrepresentation on which Allstate bases its denial of coverage is

Plaintiff's claimed amount of additional living expenses.  As discussed above, Plaintiff contacted

Allstate to explain that she found more suitable temporary housing with a monthly rent of $1,600

and a security deposit of $4,800 for a three month lease, but told Allstate that the landlord only

wanted to deal with her.  Allstate, through Grove, informed Plaintiff's public adjuster that it

would forward the money, but that Plaintiff had to sign an Advance Payment Agreement and

return it along with a copy of the lease for the temporary housing property.  Plaintiff provided a

copy of a two-page lease showing a term of April 22, 2013 to August 22, 2013, and payment

terms as indicated above.  There was no signature line for either the landlord or Plaintiff.  (Def.'s

Mot. Summ. J., Ex. T.)  Shortly thereafter, however, Plaintiff was sued on a different lease—the

Avraham Smedley Lease—which covered the same property, was in effect from May 1, 2013 to

May 1, 2014, and which required monthly rent of $1,200 per month and a security deposit of

$3,600.  (Def.'s Mot. Summ. J., Ex. V.)  This Avraham Smedly Lease was signed by both

23

Plaintiff and a representative for the landlord on May 1, 2013.  (Id.)  Allstate now asserts that

Plaintiff submitted a falsified lease in support of her request for ALE benefits, thereby causing

Allstate to pay out an artificially elevated security deposit and monthly rent.

The Court agrees that this discrepancy seems somewhat suspect, but nonetheless finds

that resolution of the issue is improper on summary judgment.  The first lease obviously covered

a three-month time period beginning April 22, 2013, whereas the second covered a one-year time

period beginning on May 1, 2013, suggesting that the longer term lease signed carried with it a

lower monthly cost.  Moreover, Plaintiff asserts that it was her then-counsel—not her—who

submitted the first lease, suggesting that she had no intent to deceive Allstate by sending them

the incorrect price.

Most importantly, however, it is crucial that Allstate was not even aware of the second

lease when it issued its denial of coverage.  Plaintiff's then-counsel forwarded the first lease—the

Reese Smedley Lease—to Allstate on July 29, 2013.   On August 15, 2013, Allstate issued its

denial of coverage citing, as its basis, Plaintiff's alleged material misrepresentations.  Allstate

only became aware of the second lease—the Avraham Smedley Lease—at the earliest on

September 17, 2013, when the landlord initiated suit against Plaintiff in Philadelphia Municipal

Court and attached a copy of that lease to the complaint.  As noted above, Allstate bears the

burden of proving that the misrepresentation is "material."  "A misrepresentation will be

considered material if a reasonable insurance company, *in determining its course of action*,

would attach importance to the fact misrepresented."  Lavin, 1992 Wl 157691, at *2 (emphasis

added) (citing Long v. Ins. Co. of N. Am., 670 F.2d 930, 934 (10th Cir. 1982)).  Clearly, Allstate

is hard-pressed to argue that an alleged misrepresentation, discovered *after* it already determined

24

its course of action with respect to Plaintiff's insurance claim, was important to its coverage decision.  As such, the Court denies summary judgment on this ground.

### 6.   Conclusion as to Defendant's Motion on Plaintiff's Breach of Contract Claim

Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim asks the Court to find, as a matter of law, that Plaintiff made material misrepresentations that warrant denial of coverage.  In order to do so, however, the Court would have to draw all reasonable inferences in favor of Allstate—contrary to the summary judgment standard.  Indeed, a review of the evidence in the light most favorable to Plaintiff suggests that Plaintiff made a valid—and undisputed—claim for an admittedly accidental fire at the Property, and that Allstate, in an effort to avoid coverage, sought out possible misrepresentations by Plaintiff using either unreliable or unconfirmed sources.  As the remaining disputes of fact are quite significant and material to the legal issues at bar, the Court declines to grant judgment for Allstate on this ground.

### B.   Defendant's Counterclaim for Insurance Fraud

Defendant next seeks summary judgment on its claim against Plaintiff for civil insurance fraud.  The Pennsylvania Insurance Fraud statute states, in pertinent part:

(a) Offense defined.–A person commits an offense if the person does any of the following:
. . .
(2) Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.
. . .
(g) Civil action.–An insurer damaged as a result of a violation of this section may sue therefor in any court of competent jurisdiction to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees. An insurer may recover treble damages if the court determines that the defendant has

25

engaged in a pattern of violating this section.

18 Pa. Cons. Stat. § 4117.  "Pennsylvania law requires an insurer alleging civil insurance fraud to demonstrate that a claimant (1) knowingly and with the intent to defraud the insurer; (2) presented to the insurer, as part of or in support of an insurance claim, false, incomplete, or misleading information; (3) concerning any fact or thing material to that claim.  Barnes v. Allstate Prop. & Cas. Ins. Co., No. Civ.A.12-3418, 2013 WL 592207, at *2 (E.D. Pa. Feb. 15, 2013).

The same factual disputes that precluded summary judgment with respect to Plaintiff's breach of contract claim also bar summary judgment for either side on the insurance fraud counterclaim. The Insurance Fraud statute requires that the claimant knowingly or with the intent to defraud the insurer present false, incomplete or misleading information regarding a material fact.  18 Pa. Cons. Stat. § 4117(a)(2).  As discussed in great detail above, the inconsistencies in the record may indeed be the product of a knowing misrepresentation by Plaintiff, but may just as easily have resulted from misconstrued evidence, improperly performed investigations, miscommunications, or unreasonable efforts by Allstate itself to find a basis on which to deny coverage.  Therefore, Allstate's Motion on this counterclaim is denied.

### C.    Defendant's Cross-Claim Against Ricketts for Insurance Fraud

Finally, Allstate seeks summary judgment on its cross-claim against Ricketts, which is brought under the same insurance fraud provision as its counterclaim against Plaintiff.  Defendant argues that, throughout the course of Allstate's investigation of the February 17, 2013 fire loss,[12]

---

[12]  Defendant's brief refers to a "February 17, 2011 water loss."  (Def.'s Mem. Supp. Summ. J. 9.)  The Court assumes this is merely a careless error and hopes it is not a result of recycling contents from a brief in a similar coverage dispute.  Indeed, the Court notes that Allstate, a large insurance company acting through legal counsel, makes multiple other factual errors in its brief, such as repeatedly referring to Plaintiff's April 22, 2013 EUO as taking place

Ricketts continually assisted Plaintiff in presenting a claim containing false, incomplete, or misleading information, and falsified documents concerning facts of things material to her claim for benefits.  In support, Allstate presents the same subject areas of falsification as it did for Plaintiff.

Contrary to Allstate's argument, however, the record before the Court is replete with genuine issues of material facts as to whether Ricketts intentionally and fraudulently misrepresented facts about the alleged loss.  Accordingly, the Court denies summary judgment on this claim as well.

## IV.    CONCLUSION

In light of the foregoing, the Court finds any grant of summary judgment in this case to be completely inappropriate.  Far from the picture Allstate attempts to portray, the evidence in this case creates a highly disputed record.  Viewing the evidence in the light most favorable to both Plaintiff and Ricketts—as the Court must do under Federal Rule of Civil Procedure 56—it remains questionable whether either individual made any material misrepresentation to Allstate in connection with the insurance claim at issue.  These factual issues are appropriately resolved at a trial by a finder of fact.  Allstate's Motion for Summary Judgment is therefore denied in its entirety.

An appropriate Order follows.

---

on March 22, 2013, stating that the Avraham Smedley Lease covered the property at 3413 N. Smedley Street instead of the property at 3513 N. Smedley Street, and claiming that the deed for the Property listed an August 18, 2013 transfer date instead of the August 18, 2012 transfer date. Yet, Defendant takes Plaintiff, a layperson, to task for some minute discrepancies in her testimony that could very well be the result of similar carelessness.  If Allstate wishes to make such demands of its insureds, it should take care to not commit the same types of errors in its legal filings.

27